CHARLES C. RAINEY, ESQ.
Nevada Bar No. 10723
*chaz@raineylegal.com*
HAMRICK & EVANS, LLP
7670 W. Lake Mead Blvd., Ste. 140
Las Vegas, Nevada 89128
+1.702.425.5100 (ph)
+1.818.763.2308 (fax)
*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

GABRIEL M. BRISTOL, an individual,       )
                                         )   Case No.: 2:16-cv-00705-JCM-CWH
            Plaintiff,                   )
                                         )
vs.                                      )
                                         )
ELIZABETH JOAN HUGHES, an                )
individual,                              )
                                         )
            Defendant.                   )
_____ )   **ANSWER AND**
                                         )   **COUNTERCLAMS**
ELIZABETH JOAN HUGHES, an                )
individual                              )
                                         )
            Counter-Claimant,            )
                                         )
vs.                                      )
                                         )
GABRIEL M. BRISTOL, an individual,       )
                                         )
            Counter-Defendant.           )
_____ )

## ANSWER AND COUNTER-CLAIMS

Defendant ELIZABETH HUGHES (hereafter referred to as the "Defendant," "Counter-Claimant" or "Hughes," depending on the context), by and through her counsel of record, Charles C. Rainey, Esq. of the law firm of HAMRICK & EVANS, LLP, hereby answers the Plaintiff's Complaint on file herein and further submits her counter-claims against Plaintiff/Counter-Defendant GABRIEL M. BRISTOL (hereafter referred to as the "Plaintiff," "Counter-Defendant" or "Bristol" depending

1

1  on the context), pursuant to and in accordance with Rule 12 of the Federal Rules of

2  Civil Procedure.

3  Dated:            Las Vegas, Nevada          *Respectfully submitted,*
                     February 8, 2017           **HAMRICK & EVANS, LLP**
4

5                                               /s/ Charles C. Rainey
                                                CHARLES C. RAINEY, ESQ./MBA/LLM
6                                                  Nevada Bar No. 10723
                                                   crainey@hamricklaw.com
7                                                  HAMRICK & EVANS LLP
                                                   7670 W. Lake Mead Blvd., Ste. 140
8                                                  Las Vegas, Nevada 89128
                                                   +1.702.425.5100 (ph)
9                                                  +1.818.763.2308 (fax)
                                                   *Attorney for Defendant*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.

## ANSWER

With respect to each and every allegation averred in the Plaintiff's Complaint, the Defendant answers as follows:

Answering Paragraph 1 of the Complaint, Defendant denies the allegations contained therein.

Answering Paragraph 2 of the Complaint, Defendant admits that she is a citizen of the State of Nevada but cannot admit the remaining allegations contained therein, as they are ambiguously worded (failing to specify whether the list of trust positions is conjunctive or disjunctive), and therefore denies such remaining allegations.

Answering Paragraph 3 of the Complaint, Defendant denies the allegations contained therein.

Answering Paragraph 4 of the Complaint, Defendant admits the allegations contained therein.

Answering Paragraph 5 of the Complaint, Defendant admits that she is subject to the general and specific personal jurisdiction of the present court, but denies all remaining allegations contained therein.

Answering Paragraph 6 of the Complaint, Defendant admits that she is subject to the general and specific personal jurisdiction of the present court.

Answering Paragraph 7 of the Complaint, Defendant admits that she resides in Clark County, Nevada, but denies all remaining allegations contained therein.

Answering Paragraph 8 of the Complaint, Defendant admits that Plaintiff received from the Defendant the sum of no less than One Hundred Sixty Six Thousand Eight Hundred Eighty Six dollars (USD$166,886.00) but denies that this sum could be characterized as a "loan" under the circumstances.

Answering Paragraph 9 of the Complaint, Defendant admits that

Defendant once perceived the Plaintiff as a personal friend, but denies all remaining allegations contained therein.

Answering Paragraph 10 of the Complaint, Defendant denies the allegations contained therein.

Answering Paragraph 11 of the Complaint, Defendant lacks sufficient information to form an opinion and/or belief as to Plaintiff's level of appreciation for any sums of money Plaintiff received from the Defendant and thus Defendant denies those allegations; furthermore, Defendant denies that she received any benefit from Plaintiff's receipt or use of the funds.

Answering Paragraph 12 of the Complaint, Defendant denies the allegations contained therein.

Answering Paragraph 13 of the Complaint, Defendant notes that she cannot admit the allegations contained therein as they are ambiguously worded (failing to specify whether the list of trust positions is conjunctive or disjunctive), and therefore denies all allegations contained therein.

Answering Paragraph 14 of the Complaint, Defendant admits that the Scorpio Trust was formed in or about January, 2015, but denies that the monies received by the Plaintiff could reasonably be characterized as a "loan."

Answering Paragraph 15 of the Complaint, Defendant admits that Defendant's attorney accused Plaintiff of misappropriating funds of the Scorpio Trust while Plaintiff served as the Trustee thereof, and further admits that Defendant had the Plaintiff removed from his position as Trustee of the Scorpio Trust, but denies all other allegations contained therein.

Answering Paragraph 16 of the Complaint, Defendant denies Plaintiff's characterization of their prior dealings and further denies that the Plaintiff's receipt of funds from the Defendant could reasonably characterized as a "loan," asserting that the funds were wrongfully misappropriated by the Plaintiff through deceit and misrepresentation.

Answering Paragraph 17 of the Complaint, Defendant denies the characterization of her statements in the subject email as a concession or admission of any specific terms of a previously negotiated loan, and furthermore is unable to authenticate the subject email at this time, and therefore denies all allegations contained therein.

Answering Paragraph 18 of the Complaint, Defendant admits that Plaintiff owes the Defendant at least One Hundred Fifty Five Thousand Two Hundred Eighty Six dollars (USD$155,286), but denies all other allegations contained therein.

Answering Paragraph 19 of the Complaint, Defendant denies the allegations contained therein as a gross mischaracterization of the events that transpired between the parties.

Answering Paragraph 20 of the Complaint, Defendant admits that she has made multiple attempts to negotiate a settlement of this matter and distill the terms of that settlement into one or more written documents, but denies all other allegations contained therein.

Answering Paragraph 21 of the Complaint, Defendant admits that she has made multiple attempts to negotiate a settlement of this matter and distill the terms of that settlement into one or more written documents, but denies all other allegations contained therein.

Answering Paragraph 22 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 23 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 24 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 25 of the Complaint, Defendant admits that she

previously asked Plaintiff to remit payments to third party creditors as a means of satisfying the balance owed to the Defendant, but denies all other allegations contained therein.

Answering Paragraph 26 of the Complaint, Defendant admits that she previously gave Plaintiff instructions on the means and method of remitting payments on the balance owed to the Defendant, but denies all other allegations contained therein.

Answering Paragraph 27 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 28 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 29 of the Complaint, Defendant admits that Plaintiff obtained the subject monies from the Defendant through deceit and misrepresentation and that Defendant's efforts to obtain repayment of the monies have met with substantial resistance on the part of the Plaintiff, but denies all other allegations contained therein.

Answering Paragraph 30 of the Complaint, Defendant admits that the entire balance of no less than One Hundred Sixty One Thousand Eight Hundred Eighty Six dollars (USD$161,886.00) is immediately due and owing and that Defendant's attorney has communicated this fact to the Plaintiff, but denies all other allegations contained therein.

Answering Paragraph 31 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 32 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 33 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 34 of the Complaint, Defendant denies all allegations

contained therein.

Answering Paragraph 35 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 36 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 38 of the Complaint, Defendant denies that there was ever any meeting of the minds and asserts that any bargain struck by the parties was founded upon misrepresentation of the Plaintiff, and further denies all other allegations contained therein.

Answering Paragraph 39 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 40 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 41 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 42 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 43 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 44 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 45 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 46 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 47 of the Complaint, Defendant denies all allegations contained therein.

Answering Paragraph 48 of the Complaint, Defendant denies all allegations

1   contained therein.

2        Answering Paragraph 50 of the Complaint, Defendant notes that the
3   assertion calls for a legal conclusion that she is unable to admit or deny in this
4   context.

5        Answering Paragraph 51 of the Complaint, Defendant denies all allegations
6   contained therein.

7        Answering Paragraph 52 of the Complaint, Defendant denies all allegations
8   contained therein.

9        Answering Paragraph 53 of the Complaint, Defendant admits that she has
10  made multiple attempts to negotiate a settlement of this matter and distill the
11  terms of that settlement into one or more written documents, but denies all other
12  allegations contained therein.

13       Answering Paragraph 55 of the Complaint, Defendant notes that the
14  assertion calls for a legal conclusion that she is unable to admit or deny in this
15  context.

16       Answering Paragraph 56 of the Complaint, Defendant admits that there is
17  an actual and present controversy between Plaintiff and Defend, but denies all
18  other allegations contained therein.

19       Answering Paragraph 57 of the Complaint, Defendant denies all allegations
20  contained therein.

21       Answering Paragraph 58 of the Complaint, Defendant denies all allegations
22  contained therein.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

## II.

## AFFIRMATIVE DEFENSES

In answering the allegations contained in the Plaintiff's Complaint on file herein, Defendant asserts the following affirmative defenses:

### FIRST AFFIRMATIVE DEFENSE

### (STATUTE OF FRAUDS)

Defendant is informed and believes, and thereon alleges that Plaintiff's claims are barred, in whole or in part, by the Statute of Frauds.

### SECOND AFFIRMATIVE DEFENSE

### (FRAUDULENT INDUCEMENT)

Any contract that the parties might have formed or intended to form is void, as the Plaintiff induced the Defendant to enter into such agreement through intentional misrepresentations, including, without limitation, the Plaintiff's express representation that the funds provided by the Defendant were to be used for the purchase of a property in San Diego and would be further secured by a perfected security interest in such property, which, when considered with any other indebtedness against said property, would not exceed the total equity in the property.

### THIRD AFFIRMATIVE DEFENSE

### (UNJUST ENRICHMENT)

Any recovery herein by Plaintiff would constitute unjust enrichment.

### FOURTH AFFIRMATIVE DEFENSE

### (MEETING OF THE MINDS)

Defendant is informed and believes, and thereon alleges that Plaintiff's claims are barred, in whole or in part, by the fact that there was never any meeting of the minds sufficient to cause the formation of an enforceable contract.

### FIFTH AFFIRMATIVE DEFENSE

### (ESTOPPEL)

Defendant is informed and believes, and thereon alleges that Plaintiff's claims are barred, in whole or in part, under the doctrine of estoppel due to Plaintiff's own conduct and actions.

## SIXTH AFFIRMATIVE DEFENSE

### (MISTAKE)

Defendant is informed and believes, and thereon alleges that Plaintiff's claims are barred, in whole or in part, under the doctrines of unilateral and/or mutual mistake.

## SEVENTH AFFIRMATIVE DEFENSE

### (INDEFINITE TERMS)

Defendant is informed and believes, and thereon alleges that Plaintiff's claims are barred, in whole or in part, by the fact that the essential terms of any attempted agreement were indefinite.

## EIGHTH AFFIRMATIVE DEFENSE

### (FAILURE OF CONSIDERATION)

Defendant is informed and believes, and thereon alleges that Plaintiff's claims are barred, in whole or in part, by a lack of consideration.

## NINTH AFFIRMATIVE DEFENSE

### (UNCLEAN HANDS)

Plaintiff's inequitable conduct constitutes unclean hands and therefore bars the Plaintiff from relief.

## TENTH AFFIRMATIVE DEFENSE

### (WAIVER)

By his own conduct and actions, Plaintiff has waived his right(s), if any, to bring this action.

## ELEVENTH AFFIRMATIVE DEFENSE

### (ACCORD AND SATISFACTION)

Defendant is informed and believes, and thereon alleges that Plaintiff's

claims are barred, in whole or in part, under the doctrine of accord and satisfaction.

### TWELFTH AFFIRMATIVE DEFENSE

#### (NO INJURY OR DAMAGES)

Defendant is informed and believes, and thereon alleges that Plaintiff has suffered no injury or damages, and therefore is not entitled to any relief.

### THIRTEENTH AFFIRMATIVE DEFENSE

#### (FAILURE TO MITIGATE DAMAGES)

Defendant is informed and believes, and thereon alleges that Plaintiff failed to take reasonable steps to mitigate his damages, if any he sustained, and therefore he is barred from recovering damages.

### FOURTEENTH AFFIRMATIVE DEFENSE

#### (REASONABLENESS AND GOOD FAITH)

Plaintiffs claims fail because Defendant acted reasonably and in good faith.

### FIFTEENTH AFFIRMATIVE DEFENSE

#### (NO BASIS FOR ATTORNEY'S FEES)

Plaintiffs Second Amended Complaint fails to allege facts, or a cause of action, sufficient to support a claim for attorney's fees.

### SIXTEENTH AFFIRMATIVE DEFENSE

#### (IN PARI DELICTO)

Plaintiffs claims, in whole or in part, are barred because Plaintiff engaged in acts and courses of conduct that rendered Plaintiff in pari delicto.

### SEVENTEENTH AFFIRMATIVE DEFENSE

#### (NOVATION)

Defendant is informed and believes, and thereon alleges that Plaintiff's claims are barred , in whole or in part, are barred under the doctrine of novation.

///

///

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (ALL APPLICABLE DEFENSES NOT MENTIONED HEREIN)

Defendant hereby gives notice that she intends to rely upon any other defenses that may become available or appear during the discovery proceedings in this case and hereby reserves the right to amend her Answer and Counterclaims to assert any such further defenses or claims based on applicable law.

### III.

### COUNTERCLAIMS

FURTHER, and by way of counter-claim against Plaintiff/Counter-Defendant GABRIEL M. BRISTOL ("Counter-Defendant" or "Bristol"), the Defendant/Counter-Claimant ELIZABETH HUGHES ("Counter-Claimant" or "Hughes") alleges as follows:

### A. PARTIES

1.      Counter-Claimant is a resident of Clark County, Nevada.

2.      Counter-Defendant owns property in both California and Nevada and, by his own admission, declares both states equally has domicile.

3.      By filing his Complaint in the above-entitled action in this Court, Counter-Defendant has alleged and consented that jurisdiction and venue are proper in this Court.

### B. COMMON ALLEGATIONS

1.      Hughes met Bristol in or about October of 2006.

2.      Initially, Hughes perceived Bristol as a good friend in whom she could confide and trust.

3.      However, over time, Bristol would betray that trust as he manipulated and exploited Hughes for his own financial gain.

### THE PURPORTED "LOANS"

4.      In the late spring of 2014, Bristol approached Hughes, asking to borrow money for the purchase of a home in San Diego County (the "San Diego

Property").

5.  Contrary to the assertions in Bristol's Complaint, Bristol approached Hughes, soliciting her financial assistance.

6.  Hughes did not instigate the transaction, nor was she in a financial position that would make such a transaction advisable.

7.  In fact, Hughes had just recently suffered a host of personal and financial setbacks, which placed her in a particularly vulnerable state.

8.  Just a few months prior, in January of 2014, Hughes' long-time boyfriend, Clint Ober, had suffered a heart attack.

9.  While in the hospital from the heart attack, Ober revealed to Hughes that he had been having an affair with another woman and that he was no longer in love with Hughes.

10.  At that point, Ober ended his relationship with Hughes.

11.  Shortly thereafter, Ober, who was also the President of the company where Hughes was employed, slashed Hughes' salary in half.

12.  This combination of unfortunate events left Hughes not only emotionally devastated, but also financially unstable.

13.  Hughes was in a particularly fragile mental state, which made her relatively easy prey for Bristol.

14.  Meanwhile, Hughes was informed and believed that Bristol was a highly paid executive.

15.  Bristol represented to Hughes that Bristol earned an annual salary in excess of Three Hundred Thousand dollars (USD$300,000.00).

16.  Bristol asserted that he was looking to purchase a home in San Diego, but, despite his high salary, had bad credit.

17.  Bristol asserted that, to improve his credit, he needed to "borrow" some money from Hughes and hold those funds in his checking account for several months.

18.     Bristol explained that the borrowed funds needed to "season" in his account for several months so that banks would take the funds into account in evaluating his creditworthiness for a mortgage.

19.     Bristol promised that once he closed on the San Diego Property, the funds would either be returned to Hughes or used as the down payment on the San Diego Property.

20.     Bristol explained that, if for some reason he was unable to purchase the San Diego Property, he would simply return the funds to Hughes.

21.     Meanwhile, Bristol insisted that if the funds were used at closing as his down payment, he would grant Hughes a second position mortgage in the San Diego Property, assuring Hughes that there would be plenty of equity in the San Diego Property to guaranty that her investment was secure.

22.     Furthermore, Bristol promised that he would pay Hughes a market reasonable annual interest rate on the balance owed to Hughes.

23.     Bristol also insisted that, as a good faith gesture, he would make monthly payments to Hughes until the full balance of the funds were returned to her.

24.     Since Hughes was in such precarious financial condition at the time, Bristol further offered to make payments from his account for any emergency expenses that Hughes might suffer in the interim while Bristol was holding her funds.

25.     Hughes understood that, if she suffered any serious financial hardship, she would be able to turn to Bristol for support, and that any funds he would pay for Hughes' benefit would be deducted from the principal amount he owed her.

26.     Based on the foregoing representations, on June 25, 2014, Hughes handed over to Bristol the initial sum of Forty Two Thousand Four Hundred dollars (USD$42,400.00) (hereafter referred to as "INSTALLMENT 1").

27.   Bristol also asked that he be added as a signor on Hughes' own checking account.

28.   Bristol claimed that he had spoken with a mortgage broker who informed him that if Bristol were listed as a signatory on an account with Hughes, then Hughes' good credit would help to prop up Bristol's bad credit.

29.   Hughes reluctantly added Bristol as a signatory on her own checking account.

30.   Also on June 25, 2014, another check was drafted on Hughes' account for Bristol's benefit, in the amount of Two Thousand Five Hundred dollars (USD$2,500.00) ("INSTALLMENT 2").

31.   As of the date of the drafting of these Counter-Claims, it is unclear whether Hughes or Bristol wrote the check for INSTALLMENT 2.

32.   In the following months, Bristol would write checks out from Hughes' account, sometimes with her prior permission and sometimes without her prior permission.

33.   In July, 2014, Bristol failed to make the good faith payment as promised.

34.   Instead, Bristol asked to "borrow" even more money from Hughes.

35.   On July 21, 2014, a series of six (6) checks totaling Forty Seven Thousand Eighty Six dollars (USD$47,086) were cut from Hughes account to Bristol ("INSTALLMENT 3").

36.   As of the date of the drafting of these Counter-Claims, it is unclear whether Hughes, Bristol, or both wrote the checks for INSTALLMENT 3.

37.   However, the existing evidentiary record does appear to confirm that, as of July 21, 2014, Bristol had "borrowed" from Hughes the total sum of Ninety One Thousand Nine Hundred Eighty Six dollars (USD$91,986.00).

38.   Again, in August, 2014, Bristol failed to make any good faith payment as promised.

39.     However, in or about August of 2014, Bristol represented to Hughes that his company (the company for which he was the chief executive officer) was seeking office space in Las Vegas and that, if she reinstated her realtor license, he would use her as the agent on the transaction – an opportunity that would have meant a hefty commission for Hughes.

40.     Based on this representation from Bristol, Hughes took the time and the effort to reinstate her realtor's license in late August.

41.     However, shortly after Hughes reinstated her realtor's license, Bristol informed her that his company had decided to hold off on new office space until next year.

42.     On or about September 14, 2014, Bristol made a modest payment of Four Hundred dollars (USD$400.00) toward the balance owed ("PAYMENT 1").

43.     However, in October, 2014, Bristol again failed to make any good faith payment as promised.

44.     Again, in November, 2014, Bristol failed to make any good faith payment as promised.

45.     In fact, on or about November 6, 2014, Bristol wrote another check out to himself on Hughes' bank account for Two Thousand Two Hundred dollars (USD$2,200.00) ("INSTALLMENT 4").

46.     Again, in December, 2014, Bristol failed to make any good faith payment as promised.

47.     In January of 2015, Bristol sent a text to Hughes suggesting that he would make a credit card payment for her benefit as a payment toward the money he owed her; however, Bristol never made the credit card payment.

48.     In January, 2015, Bristol failed to make any good faith payment as promised.

49.     However, at the end of January, 2015, Hughes established an irrevocable spendthrift trust entitled the "Scorpio Trust" and named Bristol as the

Trustee of the trust.

50.    Despite the fact that Bristol had failed to make all but one of the payments he had promised to make, Hughes still trusted that Bristol was her friend and confidant and consequently named him as the trustee of her Scorpio Trust.

51.    At this same time, in late January of 2015, at Bristol's behest, Hughes began the process of trying to find Bristol's company office space in Las Vegas.

52.    Under Bristol's orders, Hughes aggressively pursued a series of office spaces throughout the Las Vegas Valley, preparing letters of intent, negotiating with landlords, and doing everything she could to satisfy Bristol's demands.

53.    This process of trying to find Bristol an office space would continue for four long, difficult months, and require hundreds of hours of Hughes' time, and ultimately end with Bristol's company choosing not to lease any space through Hughes.

54.    On February 15, 2015, Bristol made a payment of Eight hundred dollars (USD$800.00) to Hughes ("PAYMENT 2").

55.    At first glance PAYMENT 2 would appear to be a good faith attempt to catch up on the payments Bristol had missed.

56.    However, the very same day that Bristol made PAYMENT 2 to Hughes, Bristol charged Seven Hundred Sixty Eight dollars (USD$768.00) on Hughes' credit card to pay for an inspection on a property that he was looking at in San Diego.

57.    PAYMENT 2 was effectively a wash.

58.    On February 27, 2015, Bristol signed a 2-page promissory note, in which he acknowledged that he owed Hughes Ninety One Thousand Nine Hundred Eighty Six dollars (USD$91,986.00) (the "2015 Promissory Note").

59.    It should be noted that the actual principal balance owed at this time

was, in fact, Ninety Three Thousand Seven Hundred Fifty Four dollars (USD$93,754.00).

60. The 2015 Promissory Note included an attorney fee shifting provision.

61. The 2015 Promissory Note called for at least monthly payments of Four Hundred Seven dollars (USD$407.00), due on the fifteenth day of every month.

62. The 2015 Promissory Note called for a penalty to be assessed on any payment more then five (5) days overdue, equal to twenty percent (20%) of the installment due, but in no event less than fifty dollars (USD$50.00).

63. The 2015 Promissory Note stated that upon any event of default, Hughes could demand the repayment of the entire principal sum, causing such sum to be due within ninety (90) days of the demand.

64. The 2015 Promissory Note did not have an integration clause.

65. The 2015 Promissory Note was drafted without the benefit of

66. Then, on March 1, 2015, Bristol came back to Hughes asking for yet more money.

67. This time, Bristol claimed that he owed back taxes to the Internal Revenue Service (IRS) and needed Hughes to pay the IRS, on Bristol's behalf, Fourteen Thousand Five Hundred Sixty Three and 69/100 dollars (USD$14,563.69).

68. Bristol promised that, if Hughes made this payment for him, he would make a large good faith payment toward paying off the amount he had already "borrowed" from Hughes.

69. On March 1, 2015, Hughes begrudgingly handed over to Bristol another Fourteen Thousand Five Hundred Sixty Three and 69/100 dollars (USD$14,563.69) ("INSTALLMENT 5").

70. That same day, Bristol made a payment of three thousand dollars

(USD$3,000.00) to Hughes ("PAYMENT 3").

71.    Despite PAYMENT 3, Bristol's receipt of INSTALLMENT 5 actually caused his total indebtedness to Hughes to rise.

72.    At this point, Bristol had "borrowed" from Hughes a total of One Hundred Nine Thousand Five Hundred Seventeen and 69/100 dollars (USD$109,517.69).

73.    Meanwhile, Bristol had only made a sporadic set of payment to Hughes totaling Four Thousand Two Hundred dollars (USD$4,200.00).

74.    Nevertheless, on April 1, 2015, Bristol made another payment to Hughes of Three Thousand dollars (USD$3,000.00) ("PAYMENT 4").

75.    However, by the end of April, 2015, Bristol was once again asking Hughes for more money.

76.    In late April, 2015, Bristol asked Hughes to pay One Thousand dollars (USD$1,000.00) toward one of Bristol's credit cards.

77.    Bristol insisted that the payment would help him build up his credit rating.

78.    On April 29, 2015, Hughes gave Bristol yet another installment of One Thousand dollars (USD$1,000.00) ("INSTALLMENT 6").

79.    On May 20, 2015, Bristol made another payment to Hughes of One Thousand Two Hundred dollars (USD$1,200.00) ("PAYMENT 5").

80.    The following week, on May 26, 2015, Bristol told Hughes that he was going to make another payment of One Thousand Dollars (USD$1,000.00) that day.

81.    However, Bristol did not make another payment for two weeks.

82.    On June 12, 2015, Bristol finally made a payment to Hughes of One Thousand Dollars (USD$1,000.00) ("PAYMENT 6").

83.    On July 5, 2015, without any prior approval from Hughes, Bristol withdrew another Fifty Three Thousand Two Hundred Sixteen dollars

(USD$53,216.00) from the Scorpio Trust ("INSTALLMENT 7").

84.     Hughes never authorized Bristol withdraw INSTALLMENT 7.

85.     In fact, at that time, Hughes was embroiled in two (2) separate lawsuits involving her former employer and desperately needed funds to fight those lawsuits.

86.     Bristol swore that he needed INSTALLMENT 7 to cover the down payment on his new home in Las Vegas.

87.     At this point, Bristol had apparently abandoned his plans to purchase the San Diego Property.

88.     Not only had Hughes not authorized the use of her money for a down payment on a Las Vegas home, but she would later come to find out that none of the INSTALLMENTS were used to cover the down payment on any home of Bristol.

89.     Instead, Bristol used seller financing to cover the down payment on his Las Vegas home, granting the seller a second deed of trust on the subject property.

90.     This meant that the money borrowed from Hughes was never used for its stated purpose.

91.     The money was, instead, squandered.

92.     This also meant that the real estate purchased by Bristol was so heavily leveraged that he could not afford to grant Hughes the security interest that he had originally promised her.

93.     Bristol had squandered a total of One Hundred Sixty Three Thousand Seven Hundred Thirty Three and 69/100 dollars (USD$163,733.69).

94.     While Hughes was deeply angry and hurt by the fact that Bristol had absconded with INSTALLMENT 7 without her permission, it would be several months before Hughes discovered that Bristol did not even use the INSTALLMENTS for the down payment on his home.

95.   Bristol failed to make any payment to Hughes in July, 2015.

96.   On August 1, 2014, Bristol made a payment to Hughes of Two Thousand dollars (USD$2,000.00) ("PAYMENT 7").

97.   On August 4, 2015, Hughes contacted Bristol and asked him to make a payment on one of her credit cards.

98.   Hughes still believed that Bristol would honor his original agreement to make payments on her behalf when she had urgent needs.

99.   Bristol texted back to Hughes, claiming that he would make the requested payment, but he never made the payment.

100.   In fact, Bristol made no payment at all to Hughes in September, 2015.

101.   On October 15, 2015, without any prior approval from Hughes, Bristol charged One Thousand dollars (USD$1,000) to Hughes' credit card to pay for a plane ticket for Bristol's new boyfriend.

102.   Hughes now sought to have Bristol removed from his position as Trustee of the Scorpio Trust.

103.   Hughes repeatedly asked for passwords and account access from Bristol.

104.   However, Bristol stalled and offered nothing but excuses.

105.   Hughes told Bristol that the pair needed to formalize the loan agreement, using attorney-drafted documents, and that Hughes needed updated account records, so that she could determine exactly how much money he had "borrowed."

106.   Bristol continued to stall.

107.   Bristol failed to make any payment to Hughes in October 2015.

108.   On November 15, 2015, Hughes sent to Bristol a new promissory note and deed of trust, which her attorney had drawn up.

109.   Bristol balked at the new documents, claiming that they were

complicated and confusing.

110.   After Hughes repeated demands, on November 23, 2015, Bristol finally reimbursed Hughes for the One Thousand dollars (USD$1,000.00) that he had wrongly charged on her credit card. ("PAYMENT 8").

111.   However, Bristol made no other payment to Hughes for the month of November, 2015.

112.   In fact, Bristol never made any further payment to Hughes after PAYMENT 8.

113.   On November 27, 2015, Hughes was finally able to remove Bristol as Trustee of the Scorpio Trust and gain access to the accounting records.

114.   It was at this point that Hughes began to realize the full extent of the damage caused by Bristol's self-dealing.

115.   For the next three months, Hughes desperately tried to negotiate some sort of settlement with Bristol.

116.   At every step of the way, Bristol seemed blissfully unaware of the damage that he had wrought.

117.   Indeed, Bristol acted entitled and even angry that Hughes was no longer giving him money.

118.   On February 2, 2016, Bristol dispatched a signed promissory note and deed of trust that he delivered to Hughes.

119.   However, the documents had been completely revised to make the deal overwhelmingly favorable to Bristol.

120.   Under Bristol's proposed payment plan, Hughes would likely die before actually receiving the full repayment of the note.

121.   Moreover, due to the multiple deeds of trust already encumbering Bristol's home, Hughes' was grossly under-secured.

122.   Hughes made clear to Bristol that the terms set forth in his newly signed promissory note and deed of trust were unacceptable.

123.   In early March, Bristol's tone shifted to one of outrage and anger.

124.   On or about March 3, 2016, Bristol sought to blackmail Hughes into submission.

125.   At that time, Bristol threatened that if Hughes refused his terms, Bristol would take everything he knew to Hughes' ex-boyfriend, Clint Ober.

126.   Bristol was well aware that Hughes was still embroiled in two lawsuits against Clint Ober and her former employer.

127.   Bristol believed that the confidential knowledge he had gleaned while serving as trustee of the Scorpio Trust would be valuable to Clint Ober in those cases.

128.   Consequently, Bristol sought to blackmail Hughes into accepting Bristol's one-sided terms.

129.   Hughes refused to accept Bristol's terms.

130.   Bristol then made good on his extortive threats and reached out to Ober.

131.   Bristol then filed the present lawsuit to intimidate and bully Hughes into accepting Bristol's unilateral terms of the subject transaction.

132.   In a subsequent deposition, taken under oath, Bristol, in an effort to hurt Hughes, made numerous intentional misrepresentations about her character, her past and her actions – even accusing her of criminal acts that she never committed.

## C. COUNTER-CLAIMED CAUSES OF ACTION

### FIRST COUNTER-CLAIM

(Fraudulent Inducement/Misrepresentation)

133.   Counter-Claimant incorporates by reference all of the preceding paragraphs as though fully set forth herein.

134.   Bristol made numerous false representations to Hughes in an effort to induce Hughes into: (i) loaning money to Bristol; (ii) giving Bristol access to

23

Hughes' bank account; and (iii) giving Bristol access to Hughes' credit cards.

135.    Bristol knew the representations to be false, or, at the very least, had an insufficient basis of information for making such representations.

136.    Such false representations included, but were not limited to, the following:

a.   Bristol falsely represented that the "borrowed" funds would be used for his down payment on the San Diego Property.

b.   Bristol falsely represented that, if the funds were not used for a down payment on his San Diego Property, that the funds would be returned to Hughes.

c.   Bristol falsely represented that he earned over three hundred thousand dollars (USD$300,000) annually.

d.   Bristol falsely represented that he needed to be made a signatory on Hughes' account as a means of bolstering Bristol's credit rating.

e.   Bristol falsely represented that he would keep the "borrowed" funds in his account and use them only for a down payment on a house.

f.   Bristol falsely represented that Hughes would have a perfected security interest in real estate with ample equity to cover the entirety of any funds that she might have given to Bristol.

137.    Hughes justifiably relied on these false representations.

138.    As a direct and proximate result of Hughes' reliance upon Bristol's false representations, Hughes has suffered and continues to suffer damages.

139.    Bristol initiated the present action, causing Hughes to incur legal fees and costs, including attorney's fees.

SECOND COUNTER-CLAIM

(Conversion)

140.    Counter-Claimant incorporates by reference all of the preceding paragraphs as though fully set forth herein.

141.   Bristol, in absconding with INSTALLMENT 7, committed a distinct act of dominion wrongfully exerted over Hughes' personal property.

142.   The act of dominion was in denial of, or inconsistent with, Hughes' title or rights therein.

143.   The act was in derogation, exclusion or defiance of Hughes' title or rights in the personal property.

144.   As a direct and proximate result of Bristol's conduct, Hughes has suffered and continues to suffer damages.

145.   Bristol initiated the present action, causing Hughes to incur legal fees and costs, including attorney's fees.

THIRD COUNTER-CLAIM

(Breach of Fiduciary Duty)

146.   Counter-Claimant incorporates by reference all of the preceding paragraphs as though fully set forth herein.

147.   As the Trustee of the Scorpio Trust, Bristol owed certain fiduciary duties to Hughes;

148.   Bristol breached one or more of those duties;

149.   As a direct and proximate result of Bristol's conduct, Hughes has suffered and continues to suffer damages.

150.   Bristol initiated the present action, causing Hughes to incur legal fees and costs, including attorney's fees.

FOURTH COUNTER-CLAIM

(Constructive Fraud)

151.   Counter-Claimant incorporates by reference all of the preceding paragraphs as though fully set forth herein.

152.   As the Trustee of the Scorpio Trust, Bristol owed legal and equitable duties to Hughes arising from a fiduciary relationship;

153.   Bristol breached that duty by misrepresenting and concealing

25

material facts.

154. Such misrepresentations and intentional concealments included, but were not limited to:

    a. Bristol intentionally concealed and misrepresented the fact that he did not actually use any of the monies he "borrowed" from Hughes for the down payment on his home;

    b. Bristol intentionally concealed and misrepresented the fact that he did not maintain in his account any of the monies he "borrowed" from Hughes;

    c. Bristol intentionally concealed the fact that he had taken INSTALLMENT 7.

155. As a direct and proximate result of Bristol's conduct, Hughes has suffered and continues to suffer damages.

156. Bristol initiated the present action, causing Hughes to incur legal fees and costs, including attorney's fees.

## FIFTH COUNTER-CLAIM

### (Unjust Enrichment)

157. Counter-Claimant incorporates by reference all of the preceding paragraphs as though fully set forth herein.

158. Bristol unjustly retained the money of Hughes against fundamental principals of justice or equity and good conscience.

159. As a direct and proximate result of Bristol's conduct, Hughes has suffered and continues to suffer damages.

160. Bristol initiated the present action, causing Hughes to incur legal fees and costs, including attorney's fees.

## SIXTH COUNTER-CLAIM

### (Extortion)

161. Counter-Claimant incorporates by reference all of the preceding

paragraphs as though fully set forth herein.

162.   By threatening to divulge confidential information if Hughes' did not agree to Bristol's one-sided terms, Bristol sought to unlawfully retain Hughes' property, with her consent induced by the wrongful use of threatened fear.

163.   Bristol used a threat of fear in order to retain Hughes' money.

164.   As a direct and proximate result of Bristol's conduct, Hughes has suffered and continues to suffer damages.

165.   Bristol initiated the present action, causing Hughes to incur legal fees and costs, including attorney's fees.

SEVENTH COUNTER-CLAIM

(Breach of Contract)

166.   Counter-Claimant incorporates by reference all of the preceding paragraphs as though fully set forth herein.

167.   If it is found that, despite Bristol's misrepresentations, there existed a valid and existing contract between Bristol and Hughes, then Bristol breached that contract by failing to timely remit the payments owed thereunder to Hughes.

168.   As a direct and proximate result of Bristol's conduct, Hughes has suffered and continues to suffer damages.

169.   Bristol initiated the present action, causing Hughes to incur legal fees and costs, including attorney's fees.

EIGHTH COUNTER-CLAIM

(Contractual Breach of the Implied Duty of Good Faith and Fair Dealing)

170.   Counter-Claimant incorporates by reference all of the preceding paragraphs as though fully set forth herein.

171.   If it is found that, despite Bristol's misrepresentations, there existed a valid and existing contract between Bristol and Hughes, then Bristol owed a duty of good faith and fair dealing to Hughes.

172.   Bristol breached that duty by acting in a manner that was unfaithful

to the purpose of the contract.

173.  Hughes' justified expectations were thereby denied.

174.  As a direct and proximate result of Bristol's conduct, Hughes has suffered and continues to suffer damages.

175.  Bristol initiated the present action, causing Hughes to incur legal fees and costs, including attorney's fees.

NINTH COUNTER-CLAIM

(Tortious Breach of the Implied Duty of Good Faith and Fair Dealing)

176.  Counter-Claimant incorporates by reference all of the preceding paragraphs as though fully set forth herein.

177.  If it is found that, despite Bristol's misrepresentations, there existed a valid and existing contract between Bristol and Hughes, then Bristol owed a duty of good faith and fair dealing to Hughes.

178.  A special element of reliance or fiduciary duty existed between Bristol and Hughes where Bristol was in a superior or entrusted position.

179.  Bristol breached that duty by engaging in misconduct.

180.  As a direct and proximate result of Bristol's conduct, Hughes has suffered and continues to suffer damages.

181.  Bristol initiated the present action, causing Hughes to incur legal fees and costs, including attorney's fees.

TENTH COUNTER-CLAIM

(Slander/Defamation)

182.  Counter-Claimant incorporates by reference all of the preceding paragraphs as though fully set forth herein.

183.  In his communications to Clint Ober and Client Ober's counsel, including, but not limited to, the statements made in his own sworn deposition, Bristol knowingly made a series of false representations about Hughes.

184.  The subject defamatory statements included assertions that Hughes

had engaged in criminal conduct, that she was incompetent, that she was "dangerous," and incapable of carrying out her own business affairs.

185.    Bristol knew that the statements were false or was, at the very least, negligent in making such statements.

186.    As a direct and proximate result of Bristol's conduct, Hughes has suffered and continues to suffer damages.

187.    Bristol initiated the present action, causing Hughes to incur legal fees and costs, including attorney's fees.

## ELEVENTH COUNTER-CLAIM

### (Detrimental Reliance)

188.    Counter-Claimant incorporates by reference all of the preceding paragraphs as though fully set forth herein.

189.    Bristol made a clear and unambiguous promise to financially compensate Hughes for her services as a realtor in locating and procuring office space for Bristol's company.

190.    Hughes reasonably and foreseeably relied upon Bristol's promise, exerting hundreds of hours of labor-intensive work.

191.    As a direct and proximate result of that reliance, Hughes has suffered damages.

192.    Bristol initiated the present action, causing Hughes to incur legal fees and costs, including attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE the Defendant/Counter-Claimant ELIZABETH JOAN HUGHES respectfully requests that the Court enter judgment against Plaintiff/Counter-Defendant GABRIEL M. BRISTOL and provide relief as follows:

1. That the Plaintiff/Counter-Defendant takes nothing by way of his Complaint;

2. For past and future general damages awards to Defendant/Counter-

1  Claimant on her Counter-claims;

2  3. For past and future special, actual, and compensatory damages awards to

3  Defendant/Counter-Claimant on her Counter-claims;

4  4. For punitive damages awards to Defendant/Counter-Claimant on her

5  Counter-claims;

6  5. For pre-judgment and post-judgment interest;

7  6. For reasonable attorneys' fees and costs of suit; and

8  7. For such other relief as this Honorable Court may deem just and proper.

9  Dated:        Las Vegas, Nevada        *Respectfully submitted,*

10            February 8, 2017        **HAMRICK & EVANS, LLP**

11

12            /s/ Charles C. Rainey
            CHARLES C. RAINEY, ESQ./MBA/LLM

13              Nevada Bar No. 10723
              crainey@hamricklaw.com

14              7670 W. Lake Mead Blvd., Ste. 140
              Las Vegas, Nevada 89128

15              +1.702.425.5100 (ph)
              +1.818.763.2308 (fax)

16              *Attorney for Defendant*

17

18

19

20

21

22

23

24

25

26

27

28